CARLTON, J„
for the Court:
111. Kelly Grant, individually and as the personal representative of Makayla Mag-gard’s estate and the heirs-at-law and wrongful-death beneficiaries of Maggard, appeals the Clarke County Circuit Court’s grant, of summary judgment in favor of Ford Motor Company (Ford). Grant raises the following assignments of error: whether the trial court erred by (1) failing to compel Ford to produce the design drawings of the 1996 Ford Probe; (2) excluding the affidavits of Dr. Charles W. Benedict; (3) granting Ford’s motion to exclude Dr. Benedict’s seatbelt, structural integrity, and biomechanics opinions; (4) denying her motion to compel the Rule 30(b)(6) deposition of Ford; (5) denying her motion to allow additional discovery; (6) denying her motion to amend the scheduling order; and (7) granting summary judgment in favor of Ford. Finding no error, we affirm.
FACTS
¶ 2. This case arises out of a vehicular accident on U.S. Highway 45 South in Clarke County, Mississippi, on September 28, 2002. According to the accident report, Doris B. Riley ran a stop sign on the east side of U.S. Highway 45, crossed both lanes of traffic on the northbound side of the highway, and crashed her 1998 Toyota into the driver’s side of Grant’s 1996 Ford Probe. Grant’s three-year-old daughter, Maggard, was seated in the driver’s side rear compartment of the Ford Probe and suffered a fatal head injury during the accident.
¶ 3. On December 31, 2002, Grant filed a complaint against Ford,[1] in which she alleged that her 1996 Ford Probe’s design and manufacturing defects caused and contributed to the fatal injuries of Maggard, Grant’s daughter. After several years of pretrial litigation, Ford moved for summary judgment, which the trial court granted.
¶ 4. Due to the extensive pretrial litigation in this case, we review the procedural history relevant to each of the issues presented for appellate review within our discussion of the case.
STANDARD OF REVIEW
¶ 5. This Court utilizes a de novo standard of review when reviewing a trial court’s grant of summary judgment. Webb v. Imperial Palace of Miss., LLC, 76 So.3d 759, 759-60 (¶ 3) (Miss.Ct.App.2011) (citing Anglado v. Leaf River Forest Prods., 716 So.2d 543, 547 (¶ 13) (Miss.1998)). Summary judgment must be granted “if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Id. at 760 (¶ 3) (quoting M.R.C.P. 56(c)). “This Court will consider all of the evidence before the [trial] court in the light most favorable to the non-moving party.” Id. (citing Palmer v. Anderson Infirmary Benevolent Ass’n, 656 So.2d 790, 794 (Miss.1995)). “The party opposing the motion ‘may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a *659 genuine issue for trial.’ ” Id. (quoting M.R.C.P. 56(e)).
DISCUSSION
¶ 6. Grant argues that the trial court erred by granting summary judgment in favor of Ford. Specifically, Grant alleges that the trial court’s grant of summary judgment was predicated upon the improper exclusion of the opinions of Grant’s expert witness, Dr. Benedict, and Ford’s failure to produce the design drawings of the 1996 Ford Probe vehicle. Grant alleges that the trial court erred in excluding Dr. Benedict’s opinions; failing to compel Ford to produce the design drawings of the Ford Probe vehicle; and disallowing subsequent discovery, including, but not limited to, the continuation of the Mississippi Rule of Civil Procedure 30(b)(6) deposition of Ford’s corporate representative. After reviewing the record, we find no merit to Grant’s arguments.
I. DESIGN DRAWINGS
¶ 7. During pretrial discovery, Grant requested all design drawings relating to the 1996 Ford Probe. In response, Ford alerted Grant that Mazda in Japan “was the lead vehicle engineering activity for the 1996 Ford Probe.... ” Ford referred Grant to Mazda “for additional materials regarding the design, testing, and/or assembly of the subject 1996 Ford Probe.” Ford also responded to an interrogatory as to persons involved in the design of the Ford Probe by stating, “Mazda was responsible for any design decisions, including design specifications, [for] these assemblies,” and that Ford was “without sufficient information and/or documents to respond to [Grant’s] [r]equest” and referred Grant “to Mazda for additional information responsive to this [r]equest.” In responding to Grant’s supplemental requests for production, Ford reiterated that Mazda designed the Ford Probe. Ford also provided Grant with contact information for Mazda in Japan “[t]o the extent that Mazda may have information or documents not in the possession, custody, or control of Ford[.]”
¶ 8. Subsequently, in 2008, Grant attempted to retrieve the design documents through letters rogatory to Mazda Motor of America in California. After failing in her efforts, Grant subsequently filed a motion seeking to compel Ford to produce the design documents. In her motion to compel, Grant alleged that, although Ford may lack actual possession of the drawings, Ford had control over the design drawings and should be compelled to produce the documents. However, the record reflects no evidence that Ford possessed or had lawful control or custody over the design drawings. After a hearing in August 2008 on Grant’s motion, the trial court instructed Ford to ask Mazda for the design documents. Ford subsequently informed both Grant and the trial court that Ford had requested the documents from Mazda. However, Mazda denied Ford’s request because Mazda was not a party to this lawsuit, and Mazda did not believe any legal obligation existed requiring it to provide the documents to Ford.
¶ 9. Grant again filed a supplemental motion to compel Ford to produce “documents the plaintiffs believe are under the control of Ford[.]” Ford responded that Ford possessed no control over the requested design drawings, and it could not be compelled to produce documents it did not have and could not obtain. Ultimately, the trial court denied Grant’s motion to compel.[2]
*660 ¶ 10. A trial court’s “denial of a motion to compel is subject to an abuse of discretion standard of review on appeal.” Herndon v. Miss. Forestry Comm’n, 67 So.3d 788, 795 (¶ 18) (Miss.Ct.App.2010) (quoting Edmonds v. Williamson, 18 So.3d 1283, 1292 (¶ 28) (Miss.2009)). In keeping this standard of review in mind, we find the trial court did not abuse its discretion by denying Grant’s motion to compel. Rule 34 of the Mississippi Rules of Civil Procedure sets forth the requirements for document production and states, in pertinent part, as follows:
Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on his behalf, to inspect and copy, any designated documents (including writings, drawings, graphs, charts, photographs, phono-records, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably useable form), or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody, or control of the party upon whom the request is served ....
M.R.C.P. 34(a) (emphasis added).
¶ 11. Grant argues that the trial court erred by failing to compel the production of the design drawings relating to the 1996 Ford Probe. Grant argues that Ford, at all times during the discovery period, possessed a legal right to obtain the design drawings from Mazda. In support of her argument, Grant points to the Production Agreement between Ford and Mazda, which provided, in part, as follows:
When Ford specifies a need for specifications and drawings, Mazda and AAI [ (Auto Alliance International, Inc.) ] shall provide to Ford, normally within fourteen (14) days after Ford’s request ... copies of specifications, drawings, blueprints, instructions and other supporting documentation prepared or owned by them as well as shoninzu of its vendors ... relevant to the Ford [v]ehi-cle.
Further, Grant asserts that Ford possessed a thirty-three percent ownership interest in Mazda; and that, notwithstanding Ford’s alleged contractual right to obtain the design drawing, it also possessed the ability to exercise control over Mazda.
¶ 12. After reviewing the record, we find no evidence to support the merits of Grant’s argument. As stated above, Rule 34(a) requires that documents, discoverable under Rule 26(b), be produced “which are in the possession, custody, or control of the party upon whom the request is served[.]” In this case, throughout the course of litigation, Ford continually represented to both Grant and the trial court that Ford lacked possession and control over the design documents requested by Grant. Ford asserted that Mazda possessed the design documents, and although Ford had requested Mazda to furnish the documents, Mazda refused. See Chaveriat v. Williams Pipe Line Co., 11 F.3d 1420, 1426 (7th Cir.1993); Resolution Trust Corp. v. Deloitte & Touche, 145 F.R.D. 108, 111 (D.Colo.1992) (“Rule 34 performs the salutary function of creating access to documentation in an economical and expeditious fashion by requiring a party to produce relevant records not in its physical possession when the records can be obtained easily from a third-party source.”). *661 Grant produced no evidence establishing that Ford possessed any control or custody over the design drawings.
¶ 13. Furthermore, Ford demonstrated that it possessed no legal right to obtain the design drawings from Mazda since the Production Agreement developed in 1992 had long expired.[3] The Production Agreement relied upon by Grant governed the relationship of the parties only for the production cycle of the Ford Probe from 1992 through 1997; therefore, Ford demonstrated that the parties’ obligations under the applicable automobile-development contract expired in 1997, several years pri- or to the start of the present litigation.[4] Additionally, Grant errs in asserting Ford, as a minority shareholder and a distinct corporate entity of Mazda, allowed Ford some automatic right to order Mazda to produce documents. See Gerling Int’l Ins. Co. v. Comm’r of Internal Revenue, 839 F.2d 131, 140 (3d Cir.1988) (“In the absence of control by a litigating corporation over documents in the physical possession of another corporation, the litigating corporation has no duty to produce.”); Searock v. Stripling, 736 F.2d 650, 653-54 (11th Cir.1984) (finding that a party did not have control of documents when it had made good faith efforts to obtain them from third parties, but those entities had not provided them); Am. Maplan Corp. v. Heilmayr, 203 F.R.D. 499, 502 (D.Kan.2001) (stating that the trial court’s order “effectively ignores the distinction between a corporation, on the one hand, and its officers and shareholders, on the other hand”).
¶ 14. The record is void of any evidence that Ford acted wilfully or that Ford bore fault in failing to produce the requested design documents to Grant. Accordingly, we find no abuse of discretion in the trial court’s denial of Grant’s motion to compel.
II. EXCLUSION OF DR. BENEDICT’S OPINIONS
¶ 15. Following the close of discovery on July 25, 2008, and with the trial date approaching on August 24, 2009,[5] Ford, on April 20, 2009, moved pursuant to Mississippi Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) to exclude Dr. Benedict’s opinions as to biomechanics, seatbelts, and structural integrity. The trial court set the hearing on Ford’s motions for May 26, 2009. Then, on May 20 and 21, 2009, Grant filed her responses to Ford’s motion and attached three extremely lengthy affidavits[6] from Dr. Benedict.
¶ 16. After receiving Grant’s responses, Ford objected to the materials in a letter *662 to the court because Ford argued that much of the information in Dr. Benedict’s affidavits was neither provided nor identified through Dr. Benedict’s expert designation and report and were not disclosed or referenced during the course of Dr. Benedict’s two-day deposition. Ford asserted that this constituted improper and untimely submission of supposed expert testimony. The trial court cancelled the May 26 hearing, and on May 28, 2009, Ford re-noticed the hearing for June 11, 2009.
¶ 17. On June 10, 2009, Ford filed a motion to strike the affidavits of Dr. Benedict. Ford alleges that although the motion was not filed with the clerk’s office until June 10, 2009, Grant’s counsel noted receipt of the document on June 8, 2009, the date Ford submitted the motion.[7] Ford claims that the parties had a practice of e-mailing certain documents to each other as a courtesy. At the June 11, 2009 hearing, Grant objected to arguing Ford’s motion to strike on the basis that she did not have five days’ notice. The trial court overruled the motion and noted that “there ha[d] been plenty of notice.” The trial court further stated that “[ejverybody was on board with what was going to be done here today as [of] June 1, which was 11 days ago.”[8]
¶ 18. After hearing arguments from counsel, the trial court struck the portions of Dr. Benedict’s affidavits that addressed data or information accumulated after Dr. Benedict’s deposition. The trial court also granted Ford’s motion to exclude Dr. Benedict’s seatbelt, structural integrity, and biomechanic opinions. Grant subsequently moved for the trial court to reconsider both its decision to strike the affidavits and its decision to strike the opinions of Dr. Benedict as to biomechanics, structural integrity, and seatbelts. Following a hearing on the matter, the trial court denied Grant’s motions.
A. Whether the Trial Court Erred in Excluding Portions of Dr.
Benedict’s Affidavits.
¶ 19. Grant argues that the trial court erred by not providing her sufficient notice of the June 11, 2009 hearing on Ford’s motion to strike Dr. Benedict’s affidavits as required by Rule 6(d) of the Mississippi Rules of Civil Procedure. Rule 6(d) provides, in pertinent part, as follows:
A written motion, other than one which may be heard ex parte, and notice of the hearing thereof, shall be served not later than five days before the time fixed for the hearing, unless a different period is fixed by these rules or by order of the court.
M.R.C.P. 6(d).
¶ 20. In Hughs v. Hughs, 809 So.2d 742, 744 (¶¶ 6-8) (Miss.Ct.App.2002), a party argued that she had insufficient notice that a particular issue was going to be addressed at a hearing, but this Court found that the issue was included in a broader motion. Similarly, in this case, Grant received notice that Ford objected to Dr. Benedict’s affidavits as being untimely on the day Grant filed Dr. Benedict’s affidavits with the trial court. In fact, the service of affidavits resulted in the hearing on Ford’s motion to exclude Dr. Benedict’s opinions to be moved from *663 May 26, 2009, to June 11, 2009. As such, we find that the trial court committed no error in finding that Grant had sufficient notice of Ford’s motion.
¶21. Grant argues, that notwithstanding the notice error, Ford’s motion to strike Dr. Benedict’s affidavits lacks merit and should have been denied by the trial court. Grant contends that she provided Dr. Benedict’s affidavits on May 20, 2009, some ninety-four days before the scheduled trial of this matter, and further that no dispute exists that Dr. Benedict testified in his deposition that he intended to conduct additional testing between his deposition and the trial. Grant asserts that at the deposition, her counsel specifically reserved the right to supplement, modify, enhance, and change the expert opinions as discovery continued and additional information was received or discovered. Grant further alleges that Dr. Benedict’s opinions remained the same, and therefore, Ford encountered no surprise due to the affidavits of Dr. Benedict. Finally, Grant asserts Ford presented no evidence to the court that Grant failed to diligently comply with the court’s orders or in her duty to seasonably supplement discovery.
¶22. After hearing arguments from both parties, the trial court, in excluding portions of Dr. Benedict’s affidavits, announced the following ruling from the bench:
In this case, it appears to be — there is no dispute on the facts that there was a deposition taken of Dr. Benedict on June 25 and 26 of 2008. And at that time[,] there was extensive questions made to him about what were his opinions and the bases [on which] he made the opinions. And he at that time gave various different responses as to what his bases were, the engineering principles involved, and why he came to the conclusions that he came to ... as expressed in his ultimate opinions.... [H]e was cross-examined thoroughly at that time. Now, we’ve got a trial scheduled in August, approximately two months away, and there is supplementation of all kinds of other testing and data that was accumulated after the deposition that would bolster his opinions, if not change his ultimate opinions.
I think it is true that a review of this Avance versus Ker-McGee case, it is a strikingly similar fact situation here, and I think it’s good law. And there are reasons for that law and that rule of law. There is just not any way that a [defendant can properly respond to a changing playing field as far as what an expert is going to testify to and what the basis of his opinions are.
I think clearly that Dr. Benedict is an expert in some areas and he can testify as an expert in the areas of his expertise^] and we’ll deal with that, I guess, later. But I’m not going to allow his testimony to be produced at the trial of this matter to include the supplementation and data accumulated to support his positions and bolster his opinions that were accumulated after the June 25, 26, 2008 deposition.
¶ 23. As noted in the findings as stated above, the trial court, in excluding the new portions of information in Dr. Benedict’s affidavits, relied on Avance v. Kerr-McGee Chem., LLC, No. 5:04CV209, 2006 WL 3484246 (E.D.Tex. Nov. 30, 2006). We also find guidance in Avance. In Avance, the plaintiff filed various affidavits for purposes of addressing the defendant’s Dau-bert challenges. Id. at *1. The defendants objected and argued that one of the expert’s affidavits provided by the plaintiff included “a new method for statistical analysis, new sources, and new studies”; another expert “provide[d] new sources and justifications for his opinions”; and *664 another expert “cite[d] a myriad of sources ... he relies on for the first time, or for which he expressly disavowed any reliance on in his deposition”; and another expert “cite[d] never before disclosed sources and purported] to rely on those sources to support his opinions.” Id. at *3-5.
¶ 24. The Avance court stated “[e]ven though the Federal Rules of Civil Procedure provide for supplementation, parties do not have infinite time to supplement their expert opinions with new information to respond to challenges to their experts’ original evidence.” Id. at *7. The Avance court found that the plaintiff had provided no reason why the new information in the affidavits was filed “after the expert report deadline, after the expert discovery deadline, after Daubert and summary judgment motions were filed, and less than a week from the Daubert hearing.” Id. The court further provided that “allowing the introduction of new information at this time for use in the [c]ourt’s consideration of the parties’ Daubert motions would be unfair and prejudicial to [the] [defendant because [the] [defendant would not have an opportunity for cross-examination on those new issues.” Id.
¶ 25. While we recognize that Mississippi law allows for “seasonal supplementation,”[9] the trial court in this case knowledgeable of the complexity of the products-liability claims at issue, and of the time and expense required to timely address additional information for trial, concluded that the new information in Dr. Benedict’s affidavits should be excluded.[10] We review discovery rulings by the trial court utilizing an abuse-of-discretion standard of review, and in so doing, we find no abuse of discretion by the trial court in excluding the new information in Dr. Benedicts’s affidavits. See Sanders v. Wiseman, 29 So.3d 138, 140 (¶ 7) (Miss.Ct.App.2010).
¶ 26. The Mississippi Supreme Court has held:
Discovery responses are to be supplemented seasonably pursuant to Rule 26(f) of the Mississippi Rules of Civil Procedure. It has been held that “[seasonably does not mean several months later. It means immediately.” West v. Sanders Clinic for Women, P.A., 661 So.2d 714, 721 (Miss.1995). Additionally, “seasonableness must be determined on a case by case basis looking at the totality of the circumstances surrounding the supplemental information the offering party seeks to admit.” Blanton v. Board of Supervisors, 720 So.2d 190, 195 (Miss.1998).
Bowie v. Montfort Jones Mem’l Hosp., 861 So.2d 1037, 1041 (¶ 10) (Miss.2003) (emphasis added). Accordingly, we find that this issue is without merit.
B. Whether the Trial Court Erred in Granting Ford’s Motion to Exclude Dr. Benedict’s Seatbelt, Structural Integrity, and Biomechanic Opinions.
¶ 27. Grant argues that the trial court erred in excluding the opinions of Dr. Benedict relating to seatbelts, structural integrity, and biomechanic opinions. Grant *665 contends that in accordance with Mississippi Rule of Evidence 702, Dr. Benedict’s testimony was (1) based upon sufficient facts and data; (2) was a product of reliable principles and methods; and (3) applied to facts of this ease.
¶ 28. This Court utilizes an abuse-of-discretion standard of review for the admission or exclusion of expert testimony. Patterson v. Tibbs, 60 So.3d 742, 748 (¶ 19) (Miss.2011) (citing Utz v. Running & Rolling Trucking, Inc., 32 So.3d 450, 457 (¶ 8) (Miss.2010)). We will find error in the decision of the trial court to exclude expert testimony only if the decision was arbitrary or clearly erroneous. Id. (citing Franklin Corp. v. Tedford, 18 So.3d 215, 237 (¶ 44) (Miss.2009)).
¶ 29. In addressing Daubert issues, we are guided by Rule 702, which addresses the admissibility of expert testimony:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Id. at (¶ 20) (quoting M.R.E. 702.). Furthermore, in Daubert, the United States Supreme Court held “that experts should be given wide latitude when offering opinions within their expertise.” Id. at (¶ 21) (citing Daubert, 509 U.S. at 592, 113 S.Ct. 2786). The Daubert Court rejected the standard as set forth in Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923) (superseded by statute and rule), which required “general acceptance” of the theories presented by experts, and the Supreme Court found that “expert testimony must be relevant and reliable.” Patterson, 60 So.3d at 748 (¶ 21) (citation omitted).
¶ 30. Daubert set forth several factors which trial courts may consider when determining the reliability of expert testimony: (1) “whether the expert’s theory can be or has been tested”; (2) “whether the theory has been subjected to peer review and publication”; (3) “the known or potential rate of error of a technique or theory when applied”; and (4) “the general acceptance that the theory has garnered in the relevant expert community.” Id. at 748-49 (¶ 21) (citation omitted). “These factors are nonexclusive, and their application depends on the nature of the issue, the expert’s expertise, and the subject of the testimony offered by the expert.” Id. at 749 (¶ 21) (citing Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 37 (Miss.2003)). In determining whether expert testimony is admissible, trial judges act as gatekeepers and must determine whether the proposed testimony meets the requirements as set forth in Rule 702 and Dau-bert’s relevance and reliability prongs. Id. at 749 (¶ 22).
¶ 31. The record reflects no abuse of discretion in the trial court’s application of Rule 702 and the standard set forth in Daubert. The trial court thoroughly examined Dr. Benedict’s qualifications and opinions and determined that Dr. Benedict’s opinions were unsupported by substantial testing and were wholly unreliable, and the trial court further found that Dr. Benedict was not qualified to testify as an expert in the field of biomechanics. We find the trial court’s detailed findings helpful to our disposition of this case. In its order granting Ford’s motions to exclude Dr. Benedict’s opinions, the trial court provided, in part, as follows:
In the case before this court, the [plaintiff’s expert, Dr. Benedict, has *666 provided many opinions regarding seat-belt malfunctions, structural flaws in the subject vehicle[,] and the biomechanical cause of the victim’s death. Dr. Benedict’s opinions were further delineated in his deposition on June 25-26, 2008. After deposing Dr. Benedict, the [defendant was not satisfied with the reliability of Dr. Benedict’s testimony and, later, filed three separate [mjotions to [ejxclude various portions of Dr. Benedict’s testimony. In those motions, the [defendant raises issues regarding Dr. Benedict’s seatbelt opinions, structural[-]integrity opinions[,] and biomechanical opinions. Each motion will be separately analyzed under Rule 702 and Daubert.

(A) Dr. Benedict’s [sjeatbelt opinions:

Dr. Benedict, as the [plaintiff's only liability expert, opined that the rear seat-belts in the [plaintiff’s 1996 Ford Probe were defective and unreasonably dangerous. It is Dr. Benedict’s theory that[,] “[the seatbelt] released during impact and allowed the baby seat to rotate counterclockwise and into the crush zone of the left side component .... ” Dr. Benedict explains that the seatbelt release was caused by sudden exertion of force that slightly depressed the seatbelt button and was able to jerk the latch from the buckle. Both parties refer to Dr. Benedict’s explanation of the mechanics of the faulty seatbelt as the “rebound theory.” In addition to his explanation of the faulty design of the Probe’s restraint system, Dr. Benedict also offered an alternative design that he believes should have been included in the 1996 Ford Probe.
Dr. Benedict’s “rebound theory” is an untested derivation of the more prominent “inertial unlatch” theory. Under the inertial unlatch theory!,] a seatbelt can become unbuckled if the proper amount of force is applied to the buckle housing. Dale v. Gen. Motors [Corp.], 109 F.Supp.2d [1376], 1380 (N.D.Ga.1999). While similar in theory to the inertial unlatch theory, the rebound theory is a new concept in that it involves a downward force on the buckle. Currently, the rebound theory has never been used by a qualified expert or accepted by any court in the area of Automotive Products Liability. At [his] deposition, Dr. Benedict attempts to explain his theory and claims that he plans to do several demonstrations involving snatching and striking buckles to prove his theory. However, no such testing was done at the time of the deposition.
In response to Dr. Benedict’s apparent lack of testing, the [defendant questions whether Dr. Benedict’s opinions are reliable under Rule 702 and Daubert. Specifically, the [defendant claims that: (1) Dr. Benedict’s [s]natching [demonstration is not reliable!;] (2) Dr. Benedict’s rebound theory has never been tested[;] (3) Dr. Benedict did not consider alternative [e]xplanations[;] [and] (4) there is too great an analytical gap between data and Dr. Benedict’s rebound theory. Further, the [defendant claims that Dr. Benedict’s opinions are not helpful because they do not propose a feasible alternative design. In essence, the [defendant thinks [that] Dr. Benedict’s opinions regarding seatbelts are conclu-sory opinions that are far too speculative to be considered reliable expert testimony.
First, the [defendant points out that Dr. Benedict’s snatching demonstrations are an insufficient basis for a reliable expert testimony. In Dr. Benedict’s deposition, he attempted to apply the rebound theory to the current situation with no data or testing, other than a snatching demonstration. ... In the past, courts have *667 frowned upon the use of such demonstrations as the basis for expert opinions regarding seatbelt malfunctions. See Dale[,] 109 F.Supp.2d [at] 1380.... Courts have not accepted such demonstrations primarily because they fail to take into account various factors such as webbing tensions and the proximity of the occupant to the buckle. Similarly, Dr. Benedict is unable to show what, if any, force is required to partially press a seatbelt button to allow such a release or what force was exerted on the buckle during the accident. Basically, as argued by the [defendant, Dr. Benedict’s snatching demonstration does not prove that the rebound theory is applicable to real-world automotive accidents. Without substantial evidence linking the snatching demonstration to the accident, Dr. Benedict does not have a substantial basis to prove his rebound theory. Thus, his testimony regarding the snatching demonstration is unreliable. Just as the snatching demonstration is not a reliable basis for expert testimony, the rebound theory, itself, is not reliable because it has never been tested. The following deposition excerpts illustrate Dr. Benedict’s lack of testing:
Q: Are you relying on any tests that demonstrate the release, the method of release that you are testifying about in this case?
A: Not at this point, no. But I am going to run a test where I pull the webbing and stretch it real far, like it did in the accident and then suddenly release it.
Q: Is there any reason you haven’t done that prior to issuing your final expert report giving your testimony today?
A: Because I didn’t think I needed to. But all the questions you are asking, I will go ahead and do it just to demonstrate it. I know that it will do it.
Clearly, Dr. Benedict did not conduct the proper testing to the subject vehicle to substantiate his rebound theory. [ (Footnote omitted).] Further, Dr. Benedict’s assurance that he will conduct later testing does not coincide with the rules of discovery or the agreed scheduling order in this case. The [defendant cannot be expected to re-depose an expert when he finally decides to conduct tests to substantiate an earlier opinion. Dr. Benedict’s testing at the time of the deposition and by the close of discovery is not sufficient to fully substantiate his rebound theory. Accordingly, opinions regarding Dr. Benedict’s rebound theory are unreliable under Rule 702 and Daubert and should be excluded.
In another argument questioning Dr. Benedict’s seatbelt opinions, the [defendant claims Dr. Benedict’s theories were conclusory because he did not consider an alterative explanation for the unlatching seat belt. A reliability factor listed in the advisory notes of Rule 702 is ... whether the expert actually considered alternative explanations.... Shelter Ins. Co. v. Ford [Motor Co.], [No. Civ.A. 203CV150PA,] 2006 WL [318821], * 3 (N.D. Miss. [Feb. 9,] 2006). In his deposition, Dr. Benedict simply concludes that the seatbelt had to release because it was faulty. Dr. Benedict arrives at this conclusion via testimony from the [p]laintiff claiming that the seatbelt was properly fastened before the accident and the obvious evidence that the seat-belt was unfastened after the accident. While there could be numerous reasons for the release of the seatbelt, Dr. Benedict simply concludes that the seatbelt had to be faulty.... At the time of his *668 deposition, Dr. Benedict offered no evidence that he explored any other possibilities for the release of the seat-belt. ... Clearly, Dr. Benedict’s lack of exploration into alterative causes does not create a substantial basis for his opinions regarding seatbelts in this case. In summation, the [defendant asserts that there is simply too large of an analytical jump between the data, or lack thereof, and the [sic] Dr. Benedict’s conclusions. The [defendant reiterates their earlier arguments relating to the unreliable rebound theory, the lack of study on alternative explanations^] and the overall lack of preparation by Dr. Benedict. Taken together, these flaws in Dr. Benedict’s testimony show the amount of speculation required to reach the expert opinions that the [p]laintiff is relying on in this case. Speculation of this magnitude cannot be the basis of reliable expert testimony and a trier of fact should not be subjected to such unreliable testimony.
As mentioned earlier, the [p]laintiff responded to the [defendant's allegations by allowing Dr. Benedict to file a responsive affidavit on May 19, 2009. This [c]ourt previously ruled that any new data or tests conducted after the discovery deadline would not be allowed to supplement Dr. Benedict’s earlier deposition. Without the new basis for his theories, Dr. Benedict can only respond by what was previously covered in his deposition before the discovery deadline. In his deposition, it is clear that Dr. Benedict was only able to offer opinions regarding seatbelts based on previously conducted testing on similar vehicles. As the [defendant points out, many of those tests were not immediately applicable because the, previously untested, rebound theory was being used as the basis of the seatbelt malfunction. Earlier exemplar testing with very little data recovered from the actual vehicle is not enough to warrant conclusions reached by Dr. Benedict regarding seatbelt malfunction in this case.
Lastly, a great deal of testimony provided by Dr. Benedict theorizes that a seat-belt malfunction caused or contributed to the victim’s death. However, Dr. Benedict offers no feasible alternative design that was in use when the vehicle was manufactured in 1996. Dr. Benedict offers his seatbelt patents as an example of a functioning restraint system, but his design was not used in the car industry until after the design and manufacture of the 1996 [P]robe. Likewise, Dr. Benedict proposed the belt-to-seat restraint system as an alternative design, but it was not available in 1996. Because Dr. Benedict cannot offer a feasible design alternative that was available in 1996, he is unable to show an alternative design. Without an alternative design, Dr. Benedict’s testimony is not helpful [in] trying to determine what Ford should have done to make the 1996[P]robe a safer vehicle.
For the above reasons, this [c]ourt is of the opinion that Dr. Benedict’s opinions regarding seatbelt design are not supported by substantial testing and methodology and are wholly unreliable. Thus, it is this [c]ourt’s ruling that the [defendant's [m]otion to [ejxclude Dr. Benedict’s [s]eatbelt [o]pinions is hereby granted.

(B.) Dr. BenecLict[’s] [s]tructural[-][ijn-tegrity opinions[:]

Another aspect of Dr. Benedict’s testimony is his opinion regarding the deficient structural integrity of the 1996 Ford Probe. In his initial [e]xpert [report, Dr. Benedict opined that the hinges and welds on the driver’s side of the [P]robe were defectively] designed.... He further theorized that the defective *669 nature of the hinges and welds caused them to fail at impact, allowing the 13-pillar to be torn loose and strike the victim in the head.... Dr. Benedict attempted to clarify his opinion at his deposition, but the [defendant has again questioned the reliability of Dr. Benedict’s testimony.
With evidence that the hinges were not able to withstand the force of the accident, Dr. Benedict opines that the hinges were defectively designed in that they were not able to withstand foreseeable forces.... However, the [defendant questions Dr. Benedict’s eonclusion[s] because (1) they are not based on sufficient facts; (2) they are not the product of reliable methodology; and (3) they are not based on scientific, technical, or specialized knowledge that will assist the trier of fact. For these reasons, the [defendant claims that Dr. Benedict’s structural[-]integrity opinions, like his seatbelt opinions, are unreliable and should be excluded under Rule 702 and Daubert.
A great deal of Dr. Benedict’s testimony pertaining to the [P]robe’s welds and hinges is contingent on his review of the 1996 Ford Probe [d]esign documents. As previously mentioned, this [c]ourt has already ruled that the [defendant is not responsible for producing the design documents because they are not in the [defendant's possession. The court considers the current [m]otion as a separate issue [that] is not dependant on the design documents. Dr. Benedict, on numerous occasions, stated that he could not substantiate his weld and hinge opinions without the design documents. Notwithstanding the unavailability of the design drawings, Dr. Benedict seems to arrive at specific conclusions without testing or analyzation of relevant forces and component parts involved in the accident.
First, [regarding the defective nature of the Probe’s door hinges, Dr. Benedict opined that they were faulty and needed to be “beefed up[.”] In Glenn v. Overhead [D]oor, the Mississippi Court of Appeals stated, “[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.” Glenn v. Overhead Door [Corp.], 935 So.2d 1074, 1080 (Miss.Ct.App.2006). Like the expert in Glenn, Dr. Benedict has not done any testing to substantiate his opinion and has only supplied only [sic] conclusory bottom line opinions. Specifically, Dr. Benedict did not quantify the collision forces sustained during the accident.... Also, Dr. Benedict was unsure of what the hinges were actually made of.... The only calculations performed by Dr. Benedict involved imputing highly speculative data into an equation to determine the amount of force the- hinges would withstand. He later testified, “We assumed 50,000 PSI [steel]. And I don’t even know if that is what Ford uses. I really don’t....”
Apparently, Dr. Benedict was able to base his opinion regarding the faulty design of the hinges on a comparison between door hinges in a Ford Probe and larger door hinges on a Mercedes. Dr. Benedict reasons that the Probe’s hinges were faulty because they were not as big as the Mercedes[’s] “beefed up” hinges.... However, Dr. Benedict did not use scientific testing to prove that the larger Mercedes [h]inges could sustain more force tha[n] the Ford Probe’s hinges. When asked to prove the superior design of the Mercedes hinges, Dr. Benedict responded, “All I need to do is look at it....” Dr. Benedict’s use of a Mercedes hinge as an example of how a hinge should be designed is extremely superficial and, again, not supported by any scientific *670 data. Clearly, Dr. Benedict’s theories involving the subject vehicle’s hinges, as a whole, are speculative and not based on substantial evidence. Accordingly, the court believes that they lack reliability under Rule 702 and Daubert and should be excluded.
In addition to opinions on the vehicle’s hinges, Dr. Benedict also opines that the vehicle’s structural integrity was flawed because Ford failed to include the requisite number of welds on the door to withstand foreseeable forces.... Additionally, Dr. Benedict questions the placement of the welds in the vehicle.... Like Dr. Benedict’s other structural opinions, Dr. Benedict’s weld opinions are unreliable because there is no data or scientific testing to prove his theory. Again, Dr. Benedict is faced with the reoccurring problem of having no idea of the force applied to the welds and other component parts during the accident. Also, Dr. Benedict is not familiar with the placement of the welds on the door or the amount of welds in the vehicle. Instead of conducting tests to help determine the possible amount of force required or the placement of the welds, Dr. Benedict claims that he cannot make the necessary calculations without the design drawings-In regard to the structural integrity of the vehicle, it seems that Dr. Benedict is attempting to use the lack of design drawings as an excuse for his unsubstantiated theories.
In the [mjotion to [ejxclude, the [defendant offers a federal [c]ourt case, Hafstein [Hafstienn] v. BMW [of North America, LLC ], that is particularly] instructive to this court. In Hafsteinn [Hafstienn], the Southern District of Texas excluded a metallurgist’s testimony under Rule 702 and Daubert because the metallurgist “had no evidence of where the out of specification welds in the subject vehicle were located.” Hafsteinn [Hafstienn] v. BMW [of N. Am., LLC, No. H-03-1646,] 2005 WL [5988651, *3] (S.D. Tex. [April 7,] 2005). Like the metallurgist, Dr. Benedict cannot verify the exact position of the welds during the accident. Further, unlike the metallurgist in Hafsteinn [Hafstienn], Dr. Benedict has not conducted any tests to confirm the forces at play during the accident and the composition of the component parts of the vehicle. So, in essence, the court in Hafsteinn [Hafs-tienn] excluded testimony of an expert ... that was based on more of a substantial basis than the testimony of Dr. Benedict. This court sees no reason why it should rule contrary to the ruling in Hafsteinn [Hafstienn].
In light of Dr. Benedict’s inability to conduct the proper testing to create a substantial basis for his weld and hinge opinions, this court is of the opinion that Dr. Benedict’s testimony is unreliable under Rule 702 and Daubert. For the reasons stated above, the [defendant's [m]otion to [e]xclude Dr. Benedict’s struetural[-]integrity opinions is hereby granted.

(C) Dr. Benedict's] [b]iomechanical opinions:

In the [defendant's final [m]otion to [ejxclude, Dr. Benedict’s opinions regarding the [b]iomechanical cause of the victim’s death are questioned. It is Dr. Benedict’s opinion that the B-pillar in the Probe struck the victim’s head on the rebound of the accident. The contact between the B-pillar and the victim’s head during the accident caused severe head trauma which later lead to the victim’s death. Further, Dr. Benedict links his earlier opinions with the victim’s death by claiming that the B-Pillar would not have hit the victim if the hinges and welds had been strong *671 enough and if her seatbelt had not come unbuckled. In essence, it is Dr. Benedict’s theory that the alleged defects in the Probe caused or contributed to the victim’s death....
Just as in the previous [mjotions to [e]x-clude, the [djefendant argues that Dr. Benedict’s [bjiomechanical opinions are not reliable under Rule 702 and Daubert because they are not based on substantial facts and scientific methodology. However, unlike the [mjotions regarding Dr. Benedict’s other opinions, the [dje-fendant claims that Dr. Benedict is also not qualified to render opinions in the field of [bjiomechanics. As pointed out by the [djefendant, it seems that Dr. Benedict’s only formal training in the field of [bjiomechanics was a brief course at Lynn University and a course project he worked on while in school.... Currently, Dr. Benedict has published no articles in the field of [bjiomechanics....
At least two federal ■ courts have reviewed Dr. Benedict’s qualifications in the field of [bjiomechanics and have excluded his testimony because he did not qualify] to offer opinions regarding [the] victim’s cause of death. First, the Southern District of Florida in Hoover v. Bell [Sports, Inc.] excluded Dr. Benedict’s opinions regarding the medical cause of victim’s injuries in a motorcycle accident. In Hoover, the court reasoned that “[bjecause it is undisputed that Dr. Benedict has absolutely no knowledge, skill, experience, trainingf,] or education in spinal cord or cervical injuries, the [cjourt finds that Dr. Benedict is not qualified to testify as to the medical cause of ... [pjlaintiffs injury.” Hoover v. Bell [Sports, Inc.], 92-8721-CIV-Moreno (S.D.Fla.1995). Like in Hoover, Dr. Benedict in the matter sub judice is trying to offer opinions regarding the medical cause of the victim’s death with no medical training.
The [pjlaintiffs [sic] attempts to distinguish Hoover by arguing that a medical opinion is not needed in the current action. In Hoover, Dr. Benedict argue[d] that there was a dispute as to the cause of death of the victim and that he improperly used medical opinions to substantiate his biomechanical opinions. However, in the matter sub judice, the cause of the victim’s death is undisputed[,J and no medical opinions were required. Thus, according to Dr. Benedict, he was only required to offer mechanical engineering and kinematics to prove his theory. While interesting, this [cjourt does not agree with Dr. Benedict’s reasoning. To give a biome-chanics opinion[,J you must be fully qualified to give that opinion under Daubert. Any agreement as to the cause of death or any other portion of the theory does not lower the standard in Daubert.
Next, the [djefendant points to a second Federal District Court case that has excluded Dr. Benedict’s [bjiomechanics opinions. See Hodge v. Soper, 17 Fed.Appx. 196, 197 (4th Cir.2001). In Hodge, the Fourth Circuit upheld a lower [cjourt’s exclusion of Dr. Benedict’s testimony concerning “causation of [pjhysical injury” in a wrongful[-]death ease involving a collision between a bicycle and a tractor-trailer. [M] Like Hoover, the [pjlaintiff tries to distinguish Hodge by blaming the litigating attorneys for not responding to the [d]e-fendant’s [mjotion to [ejxclude in [federal [djistrict [cjourt. This [cjourt finds the [pjlaintiffs attempt to distinguish Hodge unpersuasive.
While Hodge and Hoover illustrate a judicial unwillingness of [fjederal [cjourts to accept Dr. Benedict’s [bjiom-echanics opinions that involve the vie- *672 tim’s cause of death, perhaps the most applicable precedent is the previously cited situation [in] Hafstein [Hafstienn]. Although Dr. Benedict was not involved in this particular case, the factual similarities between the matter [s]ub [j]udi-ce and Hafstein [Hafstienn] are striking. Much like the case at bar, in Hafsteinn [Hafstienn], a child died in a car accident while seated in a car seat located in the right, rear component of a BMW. [Id. at *1]. After a suit was filed against BMW, the [p]laintiff[s] hired an expert with extensive training in mechanical engineering, biomedical engineering[,] and [bjiomechanics. [Id. at *4]. The expert attempted to opine that faulty welds caused the child to be exposed to the exterior elements of the car and sustain injuries. [Id] Subsequently, the [c]ourt in Hasteinn [Hafstienn] excluded the expert’s opinions because the expert was not qualified[,] and his opinions were not a reliable basis for his opinions. [Id. at *5-6]. When comparing the biomechan-ics credentials of the expert in Hafstein [Hafstienn] with those of Dr. Benedict, it seems that the expert in Hafsteinn [Hafstienn] was more qualified than Dr. Benedict in the field of [b]iomechanics and was still indeed unqualified. So, like the court in Hafstein [Hafstienn], the court is of the opinion that Dr. Benedict is unqualified to offer expert testimony regarding the victim’s cause of death or any other opinions involving biomechanics.
As an alternative argument, the [defendant again claims that even if Dr. Benedict is deemed qualified, he his [sic] opinions are not the product of reliable methodology and are not based on substantial facts. It is Dr. Benedict’s opinion that the victim suffered a diffuse axonal injury from contacting the B-pillar[,] and the victim would not have come into contact with the B-pillar but for the defects of the Probe. Specifically, the [defendant questions the basis for Dr. Benedict’s opinions because he did not personally review that victim’s medical records, did not make the necessary measurement in the subject vehicle[,] and was not familiar the [sic] with relevant forces involved in the crash. It appears that the [defendants are correct in their supposition that Dr. Benedict did not perform the necessary testing to substantiate his theories. First, Dr. Benedict had a biomedical engineer review the medical records and provide him a report.... Currently, it appears that Dr. Benedict has not personally reviewed all of the medical records.... Obviously, Dr. Benedict [cannot] testify about a third person diagnosis without designating that person as an expert witness. Since Dr. Benedict is not trained in biomedical theory and did not review the victim’s medical records personally, any testimony regarding the victim’s cause of death should be excluded. Next, Dr. Benedict [cannot] substantiate his opinions regarding the movement of component parts within the vehicle because he has done no measurement of the subject [P]robe. Dr. Benedict failed to measure the distance from the car to the interior trim, the depth of the crash intrusion from the Camry, how far the B-pillar had to travel to contact the victim[,] and the distance between the relevant component parts and the victim’s head. Without these measurements, Dr. Benedict cannot form reliable opinions regarding the movement of component parts during the accident. His testimony regarding the mechanics of the accident is extremely speculative and con-clusory and fails to qualify as reliable expert testimony.
Lastly, as with Dr. Benedict’s other opinions, the fact that he is not aware of *673 the relevant forces that caused the victim’s head injury. Dr. Benedict did not calculate the necessary force required to cause the axonal head injury in which the victim sustained.... Also, Dr. Benedict failed to calculate the force behind the B-pillar when it sprang back and hit the victim at the end of the crash pulse.... Instead, Dr. Benedict simply concludes that[,] “... she got whacked in the head[,] and she had a brain injury. ...” However, Dr. Benedict’s conclu-sory statement is not based on substantial facts and measurements that could have been conducted before the theories were made.
For the above stated reasons, Dr. [Benedict’s] [bjiomechanics opinions are not reliable under Rule 702 and Daubert because he is not fully qualified in the field of [b]iomechanies and, as with his other opinions, failed to conduct the proper testing and calculations to substantiate his theories. Accordingly, this court is of the opinion that the defendant’s [mjotion to [e]xclude Dr. Benedict’s [bjiomechanical opinion[s] [is] well founded and [is] hereby granted.
¶ 82. This Court recognizes the limited standard of review that appellate courts employ when reviewing a trial court’s exclusion of expert testimony. We acknowledge that we are not the trier of fact, and we will only reverse the decision of the trial court to exclude expert testimony when the decision was arbitrary or clearly erroneous. Patterson, 60 So.3d at 748 (¶ 19). The record in this ease, including the trial court’s extensive findings regarding the exclusion of Dr. Benedict’s opinions, demonstrates no abuse of discretion by the trial court in applying Rule 702 and the Daubert standard. This issue is without merit.
III. SUMMARY JUDGMENT[11]
¶ 38. When Ford moved for summary judgment on the ground that Grant lacked the ability to prove the required elements of her products-liability claim, Grant then moved the court for a stay pending Ford’s Rule 30(b)(6) deposition. Then, following that deposition, Grant sought the trial court’s permission to require Ford to appear at another deposition and to also produce additional documents;[12] Grant further asked the trial court to amend the scheduling order to allow her to conduct additional discovery. The trial court rejected Grant’s requests.
¶ 34. On appeal, Grant argues that the trial court erred as follows as related to these rulings: denying her motion to compel the completion of the 30(b)(6) deposition of Ford; denying her motion to allow additional discovery; denying her motion to amend the scheduling order; and granting summary judgment in favor of Ford. After reviewing the record before this Court, we find no merit to Grant’s allegations. We turn now to address each of these alleged errors raised by Grant.
A. Additional Discovery Requests
¶ 35. In its order denying Grant’s requests to complete Ford’s 30(b)(6) deposition and to conduct additional discovery, the trial court stated, in part, as follows:
In applying [Rule] 56(f) [of the Mississippi Rules of Civil Procedure] to the facts of this case, the [c]ourt initially ordered a stay on the [m]otion for [s]ummary judgment until discovery in *674 the matter could be completed. While the discovery deadline had long since passed in this case, the [c]ourt felt that the [defendant was obligated to honor their agreement to allow the.deposition of a Ford representative after the discovery date. In accordance with the [cjourt’s ruling, a deposition of Howard Slater, Ford Motor Company’s corporate representative, took place on August 3, 2009[,J in Jackson, Mississippi. The deposition lasted an entire day and covered a broad range of issues involving the availability of design drawings for the 1996 Ford Probe.
After reviewing the deposition transcript, the court is of the opinion that further depositions and discovery to determine the location of the 1996 Ford Probe design documents would be a waste of time and money. While the deposition of Mr. Slater did cover many relevant issues, Mr. Slater met some very contentious lines of questioning that dealt with issues outside of the scope of the deposition. Specifically, the [pjlaintiff questioned Mr. Slater about unsubstantiated internet articles, Ford’s retention policy as it relates to other vehicles[,J and the various theories alleging the Ford Probe to be the same vehicle as the Mercury Cougar. In the [cjourt’s opinion, a continuation of the [sicj Mr. Slater’s deposition would only yield more irrelevant testimony and such testimony would not assist the [cjourt’s ruling on the [djefendant’s [s]ummary[-J[j]udgment motion.
Further, as repeatedly stated, the [cjourt is satisfied the [djefendant is not in possession of design documents for the 1996 Ford Probe. From a practical standpoint, it was clear to this [cjourt that very little additional substantive evidence could have been drawn from Mr. Slater’s deposition. However, the [cjourt felt that Rule 56 of the Mississippi Rules of Civil Procedure required discovery to be closed from a procedural standpoint before a [mjotion for [sjum-mary [jjudgment should be ruled upon. As previously stated, the [cjourt is of the opinion that Mr. Slater’s deposition offered little relevant testimony on the issue of Ford’s possession of the design documents of the 1996 Ford Probe.
Lastly, even if this [cjourt were to allow the completion of the 30(b)(6) deposition and grant the [pjlaintiff s other discovery requests, their initial claim is still flawed because they are unable to prove causation of the victim’s injury. In excluding the biomechanics testimony of Dr. Charles Benedict, the [cjourt struck any proof the [pjlaintiff had regarding the causation issue. Irrespective of the presence of design drawings, the [pjlain-tiff will not be able to prove causation. Therefore, any future discovery into the availability of the design documents is moot.
¶ 36. We employ an abuse-of-discretion standard of review [for] a trial court’s management of the pre-trial discovery process. Partin v. N. Miss. Med. Ctr., Inc., 929 So.2d 924, 938 (¶ 57) (Miss.Ct.App.2005) (citing Bowie, 861 So.2d at 1042 (¶ 14)). We recognize that “[a] party may defend against summary judgment by presenting affidavits that prove ‘that he cannot for reasons stated present by affidavit facts essential to justify his opposition’; the result of such proof is that the trial court should continue the case to allow discovery to develop further.” Id. at (¶ 58) (quoting M.R.C.P. 56(f)). “However, the party resisting summary judgment must present specific facts why he cannot oppose the motion and must specifically demonstrate ‘how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant’s show *675 ing of the absence of a genuine issue of fact.’ ” Id. (citation omitted).
¶ 37. As noted by the trial judge in his above-stated findings, even if the trial court had allowed the completion of the Rule 30(b)(6) deposition and had granted Grant’s additional discovery requests, Grant’s initial claim is still flawed because she cannot prove causation of the victim’s injury due to the trial judge’s previous exclusion of Dr. Benedict’s biomechanics opinions. Thus, we find no abuse of discretion in the trial court’s decision. “[T]his Court has neither the prerogative nor the inclination to mire itself in the details of managing the pre-trial discovery process, which is properly left to the discretion of the trial court.” Partin, 929 So.2d at 939 (¶ 61) (citing Bowie, 861 So.2d at 1042 (¶ 14)).
B. Grant of Summary Judgment
¶ 38. The trial court granted summary judgment because, without expert testimony on the issue of causation, Grant lacked the ability to prove that the Ford Probe was defective. In its order granting summary judgment in favor of Ford, the trial court stated, in part, as follows:
According to the Mississippi Products Liability Act (“MPLA”), a party seeking relief in the product liability area must show proof of defect and causation. See Miss.Code Ann. § ll-l-63(a).[13] In order to prove causation, a potential [pjlaintiff must offer expert testimony that the product was defective. Hammond v. Coleman Co., Inc., 61 F.Supp.2d 533, 541 (S.D.Miss.1999). As mentioned above, the [pjlaintiffs expert opinions were previously excluded by this [cjourt because Dr. Benedict wás either unqualified to give expert testimony on the issues or his testimony was not supported by sufficient testimony or other equivalent evidence. Without expert testimony, the [pjlaintiff cannot prove causation or defect in this case and cannot maintain her claim as a matter of law.
¶ 39. Similarly, the Mississippi Supreme Court in Williams v. Bennett, 921 So.2d 1269, 1278 (¶ 27) (Miss.2006) found that the claimant failed to meet the prerequisites necessary to create a successful cause of action and thus create a triable issue of fact. The Williams court stated as follows:
When claimants do not fulfill their statutory obligation, they leave the courts no choice but to dismiss their claims because they fail to proffer a key element of proof requisite to the court’s determination of whether the claimant has advanced a valid claim under the statute. As the Supreme Court clearly said in Celotex [Corp. v. Catrett], 477 U.S. [317, 322-23, 106 S.Ct. 2548, 477 U.S. 317] [(1986)], where ... the summary judgment evidence establishes that one of the essential elements of the plaintiffs cause of action does not exist as a matter of law, ... all other contested issues of fact are rendered immaterial.
Williams, 921 So.2d at 1277 (¶ 25).
¶ 40. Mississippi Code Annotated section ll-l-63(a) provides, in pertinent-part, as follows:
(a) The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:
(i) 1. The product was defective because it deviated in a material way *676 from the manufacturer’s specifications or from otherwise identical units manufactured to the same manufacturing specifications, or
2. The product was defective because it failed to contain adequate warnings or instructions, or
8. The product was designed in a defective manner, or
4. The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and
(ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and
(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.
“Actions brought under section ll-l-63(a) require that the plaintiff ‘prove (ii), (iii), and at least one of four elements of a claim under (i).’ ” Brown v. Gen. Motors Corp. 4 So.3d 400, 402 (¶6) (Miss.Ct.App.2009) (quoting Forbes v. Gen. Motors Corp., 935 So.2d 869, 873 (¶ 5) (Miss.2006)). In this case, we have previously found that the trial court did not err by excluding the opinions of Grant’s expert witness, Dr. Benedict. Because Grant failed to offer any other evidence to support the essential elements of her claims, we find no error in the trial court’s grant of summary judgment in favor of Ford. See Webb, 76 So.3d at 759-60 (¶ 3). This issue is without merit.
¶ 41. THE JUDGMENT OF THE CLARKE COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., ISHEE, ROBERTS, RUSSELL AND FAIR, JJ„ CONCUR. IRVING, P. J., AND MAXWELL, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. BARNES, J., NOT PARTICIPATING.

. Grant also sued Doris Riley, who settled, and various companies allegedly responsible for the child-restraint device in which Makay-la was sitting in at the time of the accident. Ford alleges in its brief that the other defendants were voluntarily dismissed. We find nothing in the record to dispute Ford’s assertion.

. Grant acknowledges in her brief that the record before this Court is void of a written order denying her motion to compel. However, Grant alleges that it is undisputed that the *660 motion was made, argument was had, and the trial court denied the motion. Grant asserts that the trial court references its denial of her motion to compel in its order granting summary judgment in favor of Ford.

. See Searock v. Stripling, 736 F.2d 650, 653 (11th Cir.1984) ("Control is defined not only as possession, but as the legal right to obtain the documents requested upon demand.”).

. The "Purpose” section of the Production Agreement provides that "[t]he purpose of this Agreement is to define the development responsibilities and obligations of Mazda as the [Lead Vehicle Engineering Activity (LVEA) ] for the Second Cycle Ford Vehicle that will be assembled by AAI.... ” The Second Cycle "began on April 16, 1992[,] and is planned to end on September 30, 1997....” In addition, the "Term and Termination” provision of the Agreement provides that "Mazda has commenced development work on the [Probe] [,] ... and this Agreement covers that work and shall extend until completion of the Second Cycle”

. We are provided these dates by the trial court’s July 2, 2009 order. The trial court also noted in its order that, according to Ford, the only known exception to the discovery deadline was the deposition of Ford's corporate representative.

. Ford’s counsel informed the trial court at the June 11, 2009 hearing that Dr. Benedict’s affidavits were "over 600 pages.”

. At the June 11, 2009 hearing, Grant’s counsel admitted receipt of notice of Ford’s motion on June 8, 2009.

. Ford asserts that the trial judge, in referencing June 1, 2009, is likely referring to the original hearing date of May 26, 2009, because the trial judge refers to June 1 as the date that Grant’s counsel showed up for the cancelled hearing because he had not received the trial court’s message that it had been cancelled.

. See generally Young v. Meacham, 999 So.2d 368 (Miss.2008).

. See Sierra Club v. Cedar Point Oil Co., 73 F.3d 546, 571 (5th Cir.1996) ("The purpose of rebuttal and supplementary disclosures is just that — to rebut and to supplement. These disclosures are not intended to provide an extension of the deadline by which a party must deliver the lion’s share of its expert information.”); Cooper Tire & Rubber Co. v. Farese, 2008 WL 5104745, *4 (N.D.Miss. Nov. 26, 2008) ("[C]ourts have routinely rejected untimely 'supplemental' expert testimony where the opinions are based upon information available prior to the deadline for expert disclosures.”).

. Because we find Grant’s issues four through seven to be interrelated, we have combined them in our discussion for purposes of efficiency.

. Grant asked the trial court to compel Ford to produce shop manuals, owner’s guides, and product-source books relating to the Ford Probe.

. "Additionally, the MPLA requires proof of a Feasible Alternative Design. No such design has been proven by the [pjlaintiff in this case.”